UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


MIGUEL A. RENDON,

v.                                          Case No. 8:06-cr-472-T-17TGW
                                                      8:10-cv-2900-T-17TGW

UNITED STATES OF AMERICA.
_____

O R D E R

This cause is before the Court on Miguel Rendon's 28 U.S.C. § 2255 allegation that

his retained trial counsel, Patrick Doherty (hereinafter "Doherty"), was ineffective for failing

to move for a competency hearing for Rendon prior to Rendon's trial, and that Rendon's

appellate attorney was ineffective for failing to raise this issue on appeal. (Doc 1).[1]

On October 14, 2011, the Court held an evidentiary hearing on this claim.  Retained

counsel Michael Robert Ufferman and Don Pumphrey, Jr. represented Rendon at the

hearing.  Assistant United States Attorney Christopher Tuite appeared for the Government.

Special Agent Dan Gordon, the Drug Enforcement Agent on Rendon's underlying criminal

case, joined AUSA Tuite at counsel table.

On behalf of Defendant Rendon, the Court heard testimony from Dr. Darren

Rothschild (hereinafter "Dr. Rothschild"), a board certified forensic psychiatrist.  The

_____

[1] Documents that are referenced in this Order have been filed in both the criminal
case docket and the civil case docket.  For all of the documents from the criminal case
docket, the Court uses the designation "cr" prior to the docket number.  If no designation
appears before the docket number, the document is from the civil case.

Government called Doherty to testify.

At the conclusion of the evidentiary hearing, the Court deferred ruling on the Government's oral motion that Rendon had not met his burden of demonstrating that Doherty was ineffective for failing to move for a competency hearing for Rendon prior to Rendon's trial. (Doc 31). After a review of the testimony at the evidentiary hearing, the record, and the submissions of the parties, this Court has determined that Rendon failed to meet his burden and that Doherty was not ineffective for failing to move for a competency hearing for Rendon prior to Rendon's trial. In addition, appellate counsel was not ineffective for failing to raise this issue on appeal.

## BACKGROUND AND PROCEDURAL HISTORY

This case stems from an investigation conducted by federal, state, and local law enforcement that targeted a large-scale drug trafficking organization operating in the Middle District of Florida, Texas, and California. The investigation involved the use of confidential informants, physical surveillance, telephone records, and federal wiretaps. The wiretaps led to the interception of hundreds of drug-related calls involving Rendon and co-conspirators. Law enforcement was ultimately able to seize over 500 kilograms of cocaine and approximately three millions dollars in drug proceeds and assets from the organization.

Evidence obtained by law enforcement revealed that Rendon had been involved in the conspiracy from at least the late 1990's through Spring 2006, and that he had played a multi-faceted role in the organization. Rendon's role included distributing kilogram quantities of cocaine and pound quantities of both methamphetamine and marijuana to co-conspirators; investing in shipments of these drugs; providing high-interest loans to finance the organization's drug operation; storing large amounts of drug proceeds for the

2

organization; and renting properties to members of the conspiracy for illicit use, sometimes in exchange for drug payments.

On November 14, 2007, Rendon was charged via a Superseding Indictment, with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, 500 grams or more of methamphetamine, and 1,000 kilograms or more of marijuana.

On May 12, 2008, Rendon's case proceeded to trial. Immediately prior to the commencement of trial, the Court held a hearing during which Doherty read into the record the contents of a letter dated May 9, 2008, from Dr. Douglas R. Sinclair. The letter, which was written at the request of Carol Rendon, Rendon's wife, addressed memory problems that Rendon might experience if he testified at the trial. At the hearing, Doherty also referred to an April 6, 2007, medical report from Rendon's treating physician, Dr. Philip Rizzuto, which essentially stated that Rendon's recent and remote memory were normal. Doherty stated that he brought the matter to the Court's attention out of "an abundance of caution," but he made clear that, in the "year or so" he had been representing Rendon, he "never had any impression that ... [Rendon] had a mental or memory problem." He also indicted that he believed Rendon was competent to stand trial; therefore he did not move for a competency hearing.[2]

During the seven-day trial, the Government called six co-operating defendants who testified regarding Rendon's involvement in the conspiracy. The jury listened to a number of wiretap calls in which Rendon and co-conspirators used code words, including terms

_____

[2] During cross examination at the subsequent October 14, 2011 evidentiary hearing, attorney Doherty made it clear that when the May 9, 2008, Sinclair letter was presented to him, Doherty believed the letter was based on the results of a new examination by Dr. Sinclair. (Doc 36 - Pgs 244-246).

such as "ice," "white girls," "young girls," etc. to refer to the cocaine, methamphetamine, and marijuana they were trafficking. In addition, the Government presented testimony and evidence concerning the large quantities of narcotics, drug proceeds, and drug distribution paraphernalia that law enforcement seized during the course of its investigation, much of which was seized from properties Rendon owned and rented to co-conspirators. The Government also presented testimony regarding a box containing $27,930 that Rendon allegedly found on his property. Furthermore, testimony revealed that when law enforcement confronted Rendon about his role in the conspiracy, he admitted to participating in the off-loading of "bricks" of cocaine. Rendon claimed, however, that he thought he was unloading money, not drugs.

In Rendon's case-in-chief, Doherty called several witnesses -- Rendon's friend and member of the local community, Kenneth Lee Bright, Jr., Rendon's sister-in-law, Jean Johnson, and Rendon's wife, Carol Rendon – to refute the government's evidence.

At the conclusion of the case, the jury deliberated for several hours before returning a verdict finding Rendon guilty of conspiracy to distribute all three of the drugs alleged in the Superseding Indictment. In addition, the jury found Rendon accountable for the maximum quantities of those drugs set by statute. On September 19, 2008, the Court sentenced Rendon to 235 months incarceration.

Rendon directly appealed his final judgment to the Eleventh Circuit, arguing that this Court abused its discretion by admitting certain evidence at trial. On September 28, 2009, the Eleventh Circuit affirmed Rendon's conviction. (Copy of opinion attached as Exhibit 1.)

On December 27, 2010, Rendon timely filed a 28 U.S.C. § 2255 motion raising six grounds for relief. In a previous order dated July 15, 2011 (Doc 19), this Court denied all

grounds except Rendon's claim that Doherty was ineffective for failing to move for a competency hearing for Rendon prior to Rendon's trial and his claim that appellate counsel was ineffective for failing to raise the issue on appeal.

## RENDON'S REMAINING 28 U.S.C. §2255 CLAIM

Ground one of Rendon's 28 U.S.C. motion to vacate alleges:

> The Petitioner was not competent at the time of the trial. Trial counsel was therefore ineffective for failing to move for a competency hearing. To the extent the issue was preserved for appeal, appellate counsel was ineffective for failing to raise this issue on appeal. As a result, the Petitioner was denied his right to effective assistance of counsel in violation of the Sixth Amendment to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

(Doc 1). Rendon's memorandum in support of the motion to vacate (Doc 2), elaborates on the claim.

### Rendon's Memorandum

The evidence against Rendon was fact-intensive. Almost all of the government's evidence came from alleged co-conspirators who entered into plea agreements which required them to testify favorably for the Government. Rendon's best defense was to impeach these witnesses based on inconsistencies in their stories. To effectively implement this defense, trial counsel needed Rendon's input to understand the factual background of the case and relationship between Rendon and the government witnesses. Ultimately, only Rendon and his wife could provide the necessary information to trial counsel to enable trial counsel to properly impeach the government's witnesses.

However, Rendon submits that he was not competent at the time of the 2008 trial. At the time of trial, Rendon was 73 years old. Rendon claims that in 2008 he suffered from cognitive problems, including beginning stages of dementia. As a result, Rendon suffered

memory loss, thereby preventing him from consulting with trial counsel and assisting counsel in properly impeaching the government witnesses. Moreover, according to Rendon, his mental health problems prevented him from voluntarily, knowingly, and intelligently waiving his right to testify at trial. He also contends that, had he testified, Rendon's mental health problems would have prevented his properly and effectively testifying.

Prior to trial, trial counsel introduced a letter from Dr. Douglas Sinclair, wherein Dr. Sinclair stated:

> I'm seeing Mr. Miguel A. Rendon 8/02/1934 in my neurologic practice here in Bradenton. I am writing this letter at the request of he [sic] and his wife. He has a mild cognitive impairment which is a sign or form of early dementia.
>
> He would be expected to have some difficulty with memory or if under duress, such as testifying for Court, could have some trouble formulating thought. I have some suspicion that he also has depression, a likely reaction to his given circumstance, which can impair memory and attention.
>
> This should be taken under consideration if he is to testify. If you have any further questions, contact me.
>
> s/Douglas Sinclair, D.O., Bradenton Neurology.

After learning of Dr. Sinclair's concern, counsel and the Court proceeded to ask Rendon questions. The Court stated:

> This defendant has an absolute perfect right to take the stand if he elects to do so. if he elects to do so, if this is a sample of his memory, and what he remembers and what he doesn't remember, we may have a few problems.

The Court later added:

> You all are put on notice as far as I'm concerned, both sides, both the government and the defense. You do whatever you want to do.

Rendon points out that, despite Dr. Sinclair's concern, trial counsel failed to move for a competency hearing. Rendon claims that there was "reasonable cause" to believe

that he was not competent to stand trial, especially in light of Dr. Sinclair's letter.[3]

In support of this assertion, Rendon retained Dr. Rothschild. His report is dated December 23, 2010. In preparing the report, Rothschild reviewed information related to Rendon's case and opined that "the available information supports an assertion that Rendon had problems in his ability to consult with his attorney and assist in preparing his defense, i.e. due from cognitive dysfunction (poor memory, difficulty processing information, etc.)." (See Copy of Dr. Rothschild's December 2010 report attached as Exhibit 2 to this Order and Dr. Rothschild's October 7, 2011 updated report attached to this Order as Exhibit 2a. Exhibit 2a was introduced at the evidentiary hearing as Rendon's Exhibit 1 and Dr. Rothschild testified on and was cross examined on the original and updated reports.)

Rendon claims that the issue regarding his competency also affected his ability to make a proper decision regarding whether or not to testify during the trial. At the time of the trial, Rendon had no criminal history and the only valid reason that was discussed between trial counsel and Rendon's family as to why Rendon would not testify was a concern regarding: 1) his competency to testify; 2) his ability to understand and answer the questions; and 3) whether he would look confused in the eyes of the jury (and therefore not credible -- meaning that his testimony would cause more harm than good). Yet, Rendon claims, based on the nature of this case, Rendon's testimony was needed to refute the testimony of the government witnesses and deny his guilt to the jury.

Rendon contends that, due to his competency concerns, the decision regarding

---

[3] In addition to Dr. Sinclair's letter, prior to trial, Carol Rendon repeatedly raised concerns with trial counsel regarding Rendon's competency and memory loss.

whether he would testify was not made by Rendon. Instead, the decision was made by trial counsel, with input from Rendon's family. He also claims that he was not competent to make a decision as to whether he should testify. Rendon claims that he believed he could testify during the appeal, even if he did not testify at trial. Rendon claims his incompetency resulted in his being denied his right to make a proper decision regarding his constitutional right to testify at trial. Rendon contends that, had he been competent, he would have decided to testify and thereafter professed his innocence to the jury and refuted the testimony of the government witnesses.

**Rendon's Reply to the Government's Response to Motion To Vacate**

In his reply to the government's reponse to his motion to vacate, Rendon claims that the Government "completely failed" to address or acknowledge the report submitted by Dr. Rothschild, where Dr. Rothschild recently concluded that "[i]t is my opinion that the record and available collateral information support an assertion that during Rendon's trial in May 2008, he was not competent to stand trial." He contends the factors that the Government focused on are refuted or explained by Dr. Rothschild in his report. For example, the Government relies on the answers given by Rendon during the May 12, 2008, colloquy: "Rendon reluctantly conceded at one point that he could remember events dating as far back as the year 2000."

However, in his report, Dr. Rothschild addressed Rendon's testimony during the May 12, 2008, colloquy:

> The pretrial court transcript on May 12, 2008, gives a glimpse into Mr. Rendon's cognitive functioning at the time of the trial, which correlates with the family's description of Mr. Rendon's cognitive problems. Mr. Rendon was questioned by Mr. Doherty, Mr. Tuite, and the presiding judge in an apparent exploration of Mr. Rendon's competence to stand trial. Mr. Doherty

presented the letter from Dr. Sinclair, but did not assert the possibility that Mr. Rendon was incompetent to stand trial. Rather, Mr. Doherty's questions seemingly intended to demonstrate that the defendant did not have significant cognitive problems and that he was competent. Mr. Doherty asked several questions about Mr. Rendon's background and Mr. Rendon's responses demonstrated an acceptable memory for remote events. (Remote memory is typically preserved in the early phases of dementia.) However, Mr. Rendon's recent memory was not adequately assessed. Mr. Rendon gave affirmative answers to leading questions without an assessment of whether or not he provided correct affirmations. For example, when asked if he knew that the date was May 12, 2008, Mr. Rendon said, "Yes." The following responses to questions from Mr. Doherty provide another example of this and demonstrate the appellant's lack of awareness (or denial) of his memory problems.

Q: Do you have difficulty understanding or recalling back to 2000, the year 2000?

A: I can give it a try to remember whatever question you ask.

Q: You can remember?

A: Yeah – yes.

Mr. Rendon could not recall back to the preceding year when he was asked a series of questions about when he last visited with Dr. Sinclair, his Neurologist, which according to medical records occurred in August 2007. Mr. Rendon initially said that he did not remember when he last met with Dr. Sinclair. Mr. Tuite and the presiding judge attempted to ascertain the approximate date by asking the appellant [Rendon] approximately thirteen questions about when the last visit with Dr. Sinclair occurred. Mr. Rendon said that he did not remember and ultimately testified, incorrectly, that the most recent visit occurred after January 2010. Following this inquiry, the Judge at a sidebar said, "The defendant has an absolute perfect right to take the stand if he elects to do so. *If this is a sample of his memory, and what he remembers and what he doesn't remember, we may have a few problems.*" (emphasis added).

(Doc 2 - Exhibit 1). (The complete transcript of the colloquy (Doc. cr-109) is attached to this order as Exhibit 3.)

The Government also relied, in its response to Rendon's 28 U.S.C. § motion to vacate, on the fact that Rendon "flatly 'denie[d] any history of mental or emotional

problems.'"(quoting from the PSR at ¶ 50). But as explained by Dr. Rothschild, "Mr. Rendon [had a] lack of awareness about his cognitive problems, and [he had a] tendency to minimize [] them." Finally, Rendon complains that the Government relied on the statements of Rendon's trial counsel regarding his belief that Rendon was competent. Dr. Rothschild included in his report a comment that he "recently" contacted Doherty when preparing his report and Doherty stated that "he (Doherty) would 'not be surprised if (Rendon's) mental capacity was not all there … He was not hitting on all cylinders.'"[4] Rendon claims that this case does not concern an after-the-fact attempt to create a previously nonexistent postconviction claim. According to Rendon, there is a reasonable probability, based on Dr. Rothschild's recent report, Dr. Douglas Sinclair's pretrial letter, and the record in this case, that Rendon was not competent at the time of trial, and therefore was not able to consult with counsel or assist with the defense due to memory loss and/or was not able make a proper decision regarding whether he should testify.

## TESTIMONY AT THE EVIDENTIARY HEARING

### Dr. Darren Rothschild, Board Certified Forensic Psychiatrist

Dr. Rothschild was accepted by the Court as "qualified to render an opinion in these proceedings." (Doc. 36 - Pg 22). Dr. Rothschild testified that he was asked to perform an evaluation regarding Rendon's competency at the time of trial. (Doc 36 - Pg 24). Dr. Rothschild reviewed collateral information in conducting his evaluation. (Doc 36 - Pgs 26).

---

[4] Doherty made clear at the evidentiary hearing that Dr. Rothschild misunderstood the time frame Doherty was referring to when the two had their brief conversation regarding Rendon's mental state. As Doherty testified, "I actually thought we were talking about Miguel Rendon as of the date of the phone call – not as of the date of the trial. I'm clear on what I think on the date of the trial," namely, that Rendon was fully competent to stand trial. (Doc. 36 - pg 218).

In particular, Dr. Rothschild interviewed family members, reviewed medical records and trial transcripts, and had phone conversations with Rendon's neurologist and Doherty. (Doc 36 - Pg 26, 29). Dr. Rothschild wrote that in order for a criminal defendant to be competent, the defendant must have a present rational and factual understanding of the charges or allegations against him or her, the defendant must appreciate the potential consequences, and the defendant must have a present ability to assist in his or her own defense. (Doc 36 - Pg 27). Dr. Rothschild explained that as part of the "ability to assist component of competency," a defendant must be able to provide historical accounts to defense counsel in preparation of the defense and a defendant must be able to remember facts during the trial as such facts are being presented so that the defense can adequately confront witnesses during the trial. (Doc 36 - Pg 27). Dr. Rothschild also stated that "decision making capacity" is also a factor to be considered when determining competency (i.e., one's ability to understand and potentially waive rights, such as the decision to testify). (Doc 36 - Pg 27).

Dr. Rothschild explained that memory is a type of cognitive functioning that can affect competency. (Doc 36 - Pg 31). He stated that dementia often affects the ability to learn new memories (i.e., a person with dementia may have difficulty remembering a name that was just recently said). (Doc 36 - Pgs 33-34). Dr. Rothschild opined that Rendon's ability to form "new memories" was an issue in this case:

> So if there's a two-minute statement by a witness, he has to be able to remember all of that so he can go to his attorney and say this is not consistent with that, or I remember that this really happened then, but that — so if he can't record new memories, then that would bear on his competency.

(Doc 36 - Pgs 48-49).

Dr. Rothschild testified that it is common for someone with dementia to be unaware of the deficit. (Doc 36 - Pg 34). Dr. Rothschild stated that Rendon fit within this category (i.e., his family observed cognitive problems but Rendon was not aware of the problems[5]). (Doc 36 - Pgs 34-35).

Dr. Rothschild explained that prior to trial, Carol Rendon noticed that Rendon had gradually been suffering from memory problems for approximately the previous ten years. (Doc 36 - Pg 35). Dr. Rothschild opined that based on all of the information that he reviewed, Rendon suffered from mild cognitive impairment, which was the same conclusion that Rendon's treating physician, Dr. Sinclair, had reached. (Doc 36 - Pg 37). Dr. Rothschild added that Dr. Sinclair's letter stated that prior to trial, Rendon was suffering from symptoms of depression and anxiety and that he was under a significant amount of stress. Dr. Rothschild explained that cognitive problems become more pronounced when the person with the cognitive problem is under stress. (Doc 36 - Pg 37).

Dr. Rothschild testified that he reviewed Rendon's prison records (i.e., records created following the trial in this case) and that the records contain notations about possible dementia and memory loss. (Doc 36 - Pg 40). Dr. Rothschild added that the Pinellas County Jail records also mention that Rendon suffered from memory problems. (Doc 36 - Pg 42).

Dr. Rothschild stated that when he talked to Carol Rendon and Miguel Rendon, Jr. (hereinafter "Mike Rendon") Rendon's son, "both gave fairly consistent descriptions of a progression of cognitive changes and the nature of the cognitive changes . . . ." (Doc 36 -

---

[5] Dr. Rothschild stated that sometimes people are aware of their cognitive deficits but they do not want to admit that they are suffering such problems. (Doc 36 - Pg 35).

Pg 43). For example, Carol Rendon and Mike Rendon stated that Rendon would frequently get lost while driving around his neighborhood, a neighborhood in which he had lived for several years. (Doc 36 - Pg 43). Additionally, Mike Rendon explained that his father would need "prompts to stay on track during conversations" -- for example, Rendon would be in the middle of a conversation and would forget what he was talking about. (Doc 36 - Pg 44). Finally, Carol Rendon recalled instances when Rendon would start cooking (put a pot of water on the stove to boil) and then leave the house – forgetting that he had started to cook -- and she found the pot on the stove and the stove was still turned on. (Doc 36 - Pg 44).

Dr. Rothschild testified that he reviewed Dr. Sinclair's medical records. Dr. Rothschild stated that Rendon met with Dr. Sinclair approximately three times. (Doc 36 - Pg 114). Dr. Rothschild explained:

> My communication with Dr. Sinclair was based on objective findings, not just the reports from the defendant's wife at the time that there was decline. But his objective findings were that there were some office based tests, including the mini-mental status examination that he felt substantiated a cognitive decline.
>
> . . . .
>
> And he – he – I recall him saying he considered the possibility that this was being drummed up for court and he didn't have a sense that this was being falsified or exaggerated.
>
> . . . .
>
> And if you look back at those medical records from the first visit to the last visit he performs tests in which the defendant at the time could have easily exaggerated symptoms or if the defendant wanted to report to have memory problems it would have been very easy for him to so. And he didn't.
>
> Nonetheless, there were objective findings in those – each of those visits that – that shed light onto the possibility that there was a genuine cognitive problem besides what either the defendant or his wife had told him, and those were contained in the mini-mental status examination, the MMSE.

(Doc 36 - Pgs 113-15).

Dr. Rothschild referenced the May 12, 2008, colloquy. Dr. Rothschild stated that during the colloquy, "it was taken at face value that what [Rendon] was saying was correct when it was wrong." (Doc 36 - Pg 46). Yet, Dr. Rothschild explained that no one realized during the May 12, 2008, colloquy that Rendon's answers were incorrect and therefore his answers were "used to determine that he knew what he was saying and what was happening." (Doc 36 - Pg 46). Dr. Rothschild stated that Rendon's testimony during the May 12, 2008, colloquy "raises a question or concern about his ability to testify" at trial. (Doc 36 - Pg 55). Dr. Rothschild testified that Rendon's testimony during the May 12, 2008, colloquy "supports that proposition which was suggested by his wife and by his son that at the time of the trial he was too confused to speak coherently." (Doc 36 - Pg 55).

Dr. Rothschild explained that a proper evaluation of Rendon's condition would require some specialized skill:

> Given the nature of mild cognitive impairment, given the reported deterioration in the preceding four months prior to the trial, Mr. Rendon's described nature of understating his problems – this wasn't someone who was saying when he went to the doctor to see Dr. Sinclair, I can't remember anything, I can't do anything.
>
> There was no exaggeration according to Dr. Sinclair. If anything, Dr. Sinclair's impression was either that Mr. Rendon wasn't as aware of his problems or that he wasn't fully admitting them. So when people aren't telling you what the problems are, it's hard to know unless you have a thorough evaluation. And mild cognitive impairment is in the gray area where someone might be competent, they might not be competent. And getting a full assessment of what they can do and what they can't do would require some objective testing, neuropsychological testing to determine what his capacities are.
>
> And if there was a deficiency, let's say he had a hard time paying attention for more than a minute, then accommodations could be made where there's pauses and he's allowed to process information, talk to his attorney. If there's a problem with hearing, then, you know, accommodations are made.
>
> So those types of fine tuning would have required the expertise of a forensic neuropsychologist, psychologist, or psychiatrist.

(Doc 36 - Pgs 50-52).

Dr. Rothschild added that although Rendon expressed a desire to testify at trial, when his family told him that the prosecutor would be able to cross-examine him, Rendon "glazed over" and the cross-examination procedure "wasn't registering" with Rendon. (Doc 36 - Pg 58). Therefore, Dr. Rothschild questioned whether Rendon was able to rationally or knowingly make a decision to waive his right to testify at trial, which according to Dr. Rothschild "bears heavily on his competency at the time." (Doc 36 - Pg 59).

Ultimately, Dr. Rothschild concluded that there is "a substantial doubt that [Rendon] was not competent" at the time of trial. (Doc 36 - Pg 62). Dr. Rothschild stated that "if [Rendon] lacked memories for some of the alleged events, the circumstances, his ability to provide other witnesses or facts that would be helpful in his defense would have been prevented, and that would have been an issue affecting his competency, his ability to process what's happening during the trial, to be able to understand the proceedings." (Doc 36 - Pgs 57-58).

On cross examination, the Court learned that Rendon, or his wife, hired Dr. Rothschild to engage in a retrospective assessment of Rendon's competency at the time of trial in May 2008. Dr. Rothschild was paid approximately $13,000 for his services[6] (Doc 36 - Pg 97), and ultimately opined in his report that while Rendon "likely had a rational as well as factual understanding of the proceedings against him, . . . the available information supports an assertion that . . . [he] had problems in his ability to consult with his attorney and assist in preparing his defense." (Doc 36 - Pgs 75-76); (See Def.'s Hrg. Exh. 1 at 5-6).

---

[6] Dr. Rothschild stated that he was to be paid by "the attorney," but he did not know who was paying the attorney. (Doc. 36 - Pg 97).

Dr. Rothschild candidly admitted at the evidentiary hearing that "the bar for competency is a fairly low one" (Doc 36 - Pg 63), and that even "people of low intelligence" or "near mental retardation can be found competent to stand trial." (Doc 36 - Pg 32). Dr. Rothschild also conceded that rendering a retrospective evaluation of a defendant's competency – as he did with Rendon – is inherently problematic, and is particularly difficult where, as here, he did not have an opportunity to examine Rendon prior to or at the time of trial. (Doc 36 - Pg 71).

Dr. Rothschild also acknowledged that, while he reviewed Rendon's trial transcript, he did not have the benefit of sitting through the trial itself, nor did he have the opportunity to interview or listen to the numerous witnesses – including the 6 cooperating co-conspirators/defendants whom the government called – describe their many interactions with Rendon over the extended period of time they dealt with Rendon between at least the late 1990's through late 2005. (Doc 36 - Pgs 99-100). Nor, apparently, did Dr. Rothschild listen to the actual wiretap calls involving Rendon. (Doc 36 - Pgs 107-09).

Instead, Dr. Rothschild admitted that he relied almost exclusively on a limited number of "collateral" sources of information, the bulk of which were derived from either Carol Rendon or Mike Rendon. (See, e.g., Doc 36 - Pgs 87-90). Indeed, Dr. Rothschild devoted almost 4 hours to speaking with Carol Rendon and Mike Rendon. (Doc 36 - Pg 98). In contrast, he spent only 10 minutes interviewing Dr. Sinclair and even less time– 5 minutes – speaking with Doherty on the telephone. (Doc 36 - Pgs 98, 215).[7] Further, he

---

[7] See Footnote 4 above in which Doherty testified, "I actually thought we were talking about Miguel Rendon as of the date of the phone call – not as of the date of the trial. I'm clear on what I think on the date of the trial," namely, that Rendon was fully competent to stand trial. (Doc 36 - Pg 218).

relied on the information provided by Mike Rendon, in part, to corroborate the information he received from Carol Rendon. (See, e.g., Doc 36 - Pgs 43-44, 92, 99).

Dr. Rothschild did not interview either Carol or Mike Rendon in person, and instead spoke with them only on the telephone. (Def.'s Hrg. Exh. 1 at 2-4). Further, his telephone conversations with these two occurred within a 3-day time span of each other, and included discussions with the two of them on the same day. (Def.'s Hrg. Exh. 1 at 2-4; Doc. cv- 36 at 98). Although Dr. Rothschild subsequently devoted the majority of the "Sources of Information" portion of his report to the assertions Carol and Miguel Rendon, Jr. made about Rendon's competency, at no point in his report did Dr. Rothschild address the possibility that these two loved ones conferred with each other ahead of time as to what they were going to tell him, or that they were even present when the other was being interviewed. (Doc 36 - Pg 99).  Nor did he address, or even acknowledge, the conflict between what Carol and Mike Rendon told him and what the witnesses – including the 6 cooperating defendants – testified to at trial regarding Rendon's ample mental capabilities.

Despite Dr. Rothschild's extensive reliance on the information supplied to him by Carol Mike Rendon, Rendon's attorneys did not call either of these two family members to testify at the evidentiary hearing. Nor did they call Dr. Sinclair to testify regarding his analysis of Rendon's mental capabilities based on his examinations of Rendon prior to trial.

### Patrick Doherty, Esquire

Doherty testified at the October 14, 2011 evidentiary hearing that he is a 1972 graduate of Loyola Law School, where he served on the school's Law Review and authored several articles about criminal law. (Doc 36 - Pg 156). Following his graduation, Doherty worked for 3 years as an Assistant Public Defender at the Pinellas County Public

Defender's Office. (Doc. 36 - Pgs 156-57). During his tenure there, Doherty handled up to 300 - 400 felony cases a year and defended clients in a total of 42 trials, most of which involved defendants accused of "life felonies," including rapes, robberies and first degree murder. (Doc 36 - Pgs 157-58). Doherty was ultimately put in charge of all capital cases in North Pinellas County. (Doc 36 - Pg 157).

Upon leaving the Public Defender's Office, Doherty joined the private criminal defense bar. (Doc 36 - Pg 158). Since then, Doherty has focused exclusively on criminal defense work and has represented hundreds, if not thousands, of defendants in both Federal and State court. (Doc 36 - Pgs 158-59). He has also tried roughly 200 cases during that time period, including the "Commissioner's" trial and the "BCCI" case, both of which lasted 6 months. (Doc 36 - Pgs 157-59). In addition, Doherty has handled a number of death penalty cases over the years, almost all of which involved defendants with psychiatric issues and which required extensive work with psychiatrists. (Doc 36 - Pgs 160-61).

Doherty's abilities as a defense attorney have earned him a number of awards, including the <u>St. Petersburg Times</u>' Nelson Pointer Award for his work with civil liberties. (Doc 36 - Pg 161). He has also been twice elected by his peers as the President of the Pinellas County Criminal Defense Lawyers, and has served on the Board of Governors for Young Lawyers. In addition, since 1985, he has been rated by <u>Martindale- Hubbell</u> as an A-rated lawyer. (Doc 36 - Pg 161).

Based on his extensive experience as a criminal defense attorney, both as an Assistant Public Defender and in private practice, Doherty is intimately familiar with issues pertaining to his clients' competency. That experience is predicated not only on his countless interactions with the many clients he has represented, but includes numerous

conversations he has had over the years with the psychiatrists with whom he has worked. (Doc 36 - Pgs 168-69). Doherty considers the matter of his client's competency to be the proverbial "elephant in the room," and the one "single fact" a defense attorney must know about his client throughout the time period of representing that individual. (Doc 36 - Pgs 164- 65, 172-73).

In determining whether his client's competency is suspect, Doherty looks at a number of factors, ranging from the particular facts of the case, to his clients' appearance (hygiene, grooming, etc.), their attentiveness, their speech pattern and expressions, the responsiveness and coherence of their answers, their possible changes in behavior throughout the period of representation, and even their timeliness for appointments. (Doc 36 - Pgs 162-68).

In the end, Doherty recognizes from experience that his clients can become less competent as time progresses, and thus remains vigilant in his attentiveness to the issue throughout the course of his representation. (Doc 36 - Pgs 162-68). Doherty also recognizes, however, that he cannot simply assert issues of competency as a strategic ploy to gain his client an advantage in the courtroom, and instead knows that, as an officer of the Court, he must have a good faith belief that his client is incompetent before bringing the issue to the Court's attention. (Doc 36 - Pgs 162-68). As Doherty explained in this regard at the evidentiary hearing:

> Q. What does it take for you as a practitioner, whether in State or Federal Court, to file a motion with the Court to seek a competency evaluation?
>
> A. Yeah, that's a good question. I think it takes a good faith basis, a good faith belief on my part that there's something arguably wrong here. That my client is arguably not competent to stand trial.

Not that they miss a word, not that they are slow to recall an address or a name. But there's got to be some reason to believe . . . that there's an arguable case that they're not competent to stand trial. That's what I think.

And I think in this case and in every case is not something I can defer to my client's wife and say, well, she thinks he's not competent and so I'm going to file the motion. I can't do that. I'm an officer of the court. I have to take the responsibility here to make this judgment myself.

And I really feel like the Court is counting on me to make a fair judgment here. Is this an issue or isn't it an issue. And if it is, raise it. And if it's not, don't raise it.

(Doc 36 - Pgs 162-68).

In this case, as evidenced by his testimony at the evidentiary hearing, Doherty did not have a good faith basis to pursue a competency hearing for Rendon based on his extensive interactions with Rendon during the year-and-a-half he represented him. (Doc 36 - Pg 214). Indeed, as set forth below, Doherty found Rendon throughout the period of representation to be "clearly" and "completely competent," (Doc 36 - Pgs 190, 268), and, in fact, as someone who "function[ed] on one of the highest level[s] of anybody . . . [he had]represented recently." (Doc 36 - Pg 256).

Doherty began representing Rendon in December 2006 and continued to represent him through the conclusion of Rendon's trial in May 2008. (Doc 36 - Pgs 169-70). During that time period, Doherty met with Rendon in person on "at least" 15 occasions – "typically for an hour or more" – and spoke with Rendon on at least a handful of other occasions as well. (Doc 36 - Pg 10). While the majority of Doherty's face-to-face meetings with Rendon took place at Doherty's office, some of them occurred at Rendon's home in Bradenton. (Doc 36 - Pgs 170-71).

Doherty's meetings with Rendon began even before he received the government's

discovery and involved discussions with Rendon regarding Rendon's knowledge of the facts of the case. (Doc 36 - Pgs 171, 195). As time went on and the government's discovery began to come in, Doherty spoke with Rendon more and had an even greater opportunity to see him "interact with the evidence as it[] unfold[ed]." (Doc 36 - Pgs 171; 195-96).

During his many meetings and conversations with Rendon, Doherty watched Rendon "like a hawk," listening carefully to "every word" he said and examining "everything he d[id]" for any possible issues with respect to his competency. (Doc 36 - Pgs 172-73, 227, 235- 36). In all of this time, however, Doherty never witnessed anything that would have remotely led him to suspect Rendon was incompetent. Doherty, for example, never saw Rendon express any signs of dementia, never saw any distinction between Rendon's remote and present memory, never found Rendon to be non-responsive towards him, and never saw him lose his train of thought. (Doc 36 - Pgs 173-74, 184).

Quite the opposite, Doherty found Rendon to be "very bright" and "one of the most capable people" he had ever met, a self-made man fluent in 2 languages who had both successfully built-up and continued to manage up until the time of his trial 2 legitimate, hands-on businesses – one involving his rental properties and the other involving the sale of palm trees – while at the same time, at least until 2006, trafficking in major quantities of narcotics. (Doc 36 - Pgs 175-77, 196-97, 260).

Doherty also found Rendon's memory to be "great" (Doc 36 - Pg 175), so much so that he was able to provide Doherty with a vivid description of the material aspects of his case, including his relationship with his co-conspirators and the circumstances surrounding his arrest. (Doc 36 - Pgs 174-177, 251). In one of their meetings together in Bradenton

which occurred in late 2006 or early 2007, prior to Doherty's receipt of the government's discovery, Rendon drove Doherty "around to all of the rental units" implicated in the case, and explained to Doherty "who rented those units, which of these co-conspirators – the people who would later testify against him – lived in which rental unit, how long they'd lived in the rental units, when they vacated the rental units and anything he thought would cause them to testify falsely against him." (Doc 36 - Pgs 175-76). At the evidentiary hearing, Doherty explained the significance of this episode as it related to the issue of Rendon's competency:

> In other words, at that moment in the case I don't have discovery yet. He's telling me what the case is about. And so he's telling me that these people are testifying falsely against him and that they are his tenants. And this is where this one lives and this is where this one lives. And, by the way, this one pays this amount of rent and this one is behind on the rent.

> And this one over here on Sneed Avenue had too many people in the house, and I threw them out because the septic tank was overloading and on and on and on. He was rich in detail as to who was living where and what they were paying and what – what his relationships were with them.

(Doc 36 - Pg 176).

As another example of Rendon's competency, Doherty testified about a proposed examination of Rendon and his wife that he received from Carol Rendon prior to trial. (Doc 36 - Pgs 202-03; Govt's Hrg. Exh. 3). Included in those proposed examinations were detailed descriptions of the factual circumstances surrounding many of Rendon's co-conspirators. Of significance, however, as Carol Rendon had claimed that she knew nothing about these co-conspirators, it was evident to Doherty that the information contained in the document had come from Rendon, thereby further evidencing his competency. (Doc 36 - Pgs 206-08).

Like many of his clients, the only instances in which Rendon expressed any real hesitancy in answering Doherty's inquiries regarding the case was when he was asked to explain a particularly incriminating piece of evidence for which there was no answer consistent with innocence. (Doc 36 - Pgs 181-84, 194, 252). Then, and only then, would Rendon respond, "I don't know." (Doc 36 - Pgs 181-84, 194, 252).

Doherty also had no reason to suspect Rendon's competency from his knowledge of the facts of Rendon's case. In this regard, it became clear to Doherty, both from his review of the evidence and his many interactions with Rendon, that Rendon had, for many years, been successfully able to "liv[e] 2 different lives," run "3 different businesses," and "speak[] 2 [different] languages." (Doc 36 - Pg 175). As Doherty explained at the evidentiary hearing:

> [Rendon] not only managed . . . [his rental] properties, he managed those properties in a hands on way. He kept the ledgers and the books. He also did the plumbing. He did the ceramic work. He did the painting. He did all the maintenance that he could.
>
> He's a smart business person, and part of being a smart business person is he knows to keep his overhead as low as he can. And he's doing that while he's also running a palm business where he plants palm trees and grows them to maturity and sells those. Plus, there's substantial evidence that he was running a third business as well that was criminal in nature.

(Doc 36 - Pgs 196- 97).

Doherty's receipt of Dr. Sinclair's report in **April 2007** buttressed his conclusions regarding Rendon's competency. As a prelude to that report, Doherty had noticed that – like any 72 year old in his eighth decade of life – Rendon occasionally had moments where he would "pause[] to think of a name," an "address" or "a date." (Doc 36 - Pgs 173, 258-59). While Doherty considered such instances wholly unremarkable, particularly since – in

addition to his age – Rendon was communicating with him in English, not his native tongue of Spanish (Doc 36 - Pgs 173-75, 256), Carol Rendon, would interrupt her husband when he hesitated to answer a question and say "Well, you've got dementia." (Doc 36 - Pg 173). Doherty obviously disagreed with Carol Rendon, concluding – in his experienced judgment – that Rendon was "not suffering from dementia," and was instead "normal." (Doc 36 - Pg 223).

Nonetheless, as Doherty explained at the evidentiary hearing, to appease Carol Rendon, he ultimately recommended that she take her husband to a physician of her own choosing and, once she did, that physician – Dr. Sinclair – determined that Rendon was, in fact, normal.

> Miguel [Rendon] would pause on a word as I just did, and his wife would speak over him and say, well, he's got dementia and/or Alzheimer's or something like that.
>
> And to me it just seemed like he was a normal fellow of 72 years of age who was having . . . the normal 72 years of age things happen to him. . . . But she kept bringing it up. So I said to her, if you think this is a problem, go to a doctor and have him looked at. . . . I didn't chose the doctor because I didn't want to get involved. I didn't want them to say that I chose the doctor or something.
>
> So they went to see Dr. Sinclair. They bring me back a report and . . . the report says that he's normal.

(Doc 36 - Pg 210).

In that report, which was dated **April 6, 2007**, and which Doherty reviewed with Rendon, Dr. Sinclair stated that Rendon's "mental status is normal, that he did an MMSE, which is a memory test," . . . [a]nd . . . [that Rendon] got 28 questions right out of 30." (See Gov't's Hrg. Exh. 1). In the same report, Dr. Sinclair also indicated:

> [Rendon's] recent and remote memory are within normal limits, immediate

recall is normal. There's no aphasia, apraxia or agnosia noted. No right or left confusion was appreciated. There's no visual spacial distortions. No signs of thought disturbances. The patient was oriented as to time, place and person attention span and concentration are normal and the fund of knowledge is normal. He does have mild memory loss which, of course, every 71-year old has.

(Govt's Hrg. Exh. 1). Dr. Sinclair's assessment that Rendon's mental status was normal was one that Doherty shared, as did Rendon himself. (Doc 36 - Pgs 211, 221-22, 226). As Doherty explained at different points during the evidentiary hearing:

[T]his is exactly what I was seeing when I was talking to Mr. Rendon. He is a very pleasant – he's great guy, . . . and he's a very effective guy. I never thought he was perfect, but I definitely knew he was normal. And so I got this report back and the first word is that his mental status is normal.

\*\*\*

We had a guy . . . – meaning Mr. Rendon, who says he's fine. I've got a doctor who says he's normal. And I'm looking at him and he is normal.

(Doc 36 - Pgs 211, 226). Doherty also recognized that the portion of Rendon's neurological history in Dr. Sinclair's report which purported that Rendon had any kind of mental issues was "almost entirely made up of what Mrs. Rendon sa[id]." (Doc 36 - Pg 224; see also Doc 36 - Pg 245)("the neurological history[] went on ten times to say she said, she said and she said[, b]utwhen it came down to doing the tests and running the tests and reading the data, his mental status was normal").

In the days leading up to trial, Doherty had two meetings with Rendon to address the issue of whether Rendon was going to testify at trial. (Doc 36 - Pgs 185-89). During the first meeting, which occurred on May 8, 2008, and which Carol Rendon apparently also attended, Doherty conducted a mock cross-examination of Rendon and found that, while Rendon did "fine on a lot of details and a lot of the lead up," as before, he did not have an

answer consistent with innocence for the particularly incriminating proof against him. (Doc 36 - Pg 185). Doherty met again with Rendon and his wife the next day and experienced the same phenomenon. (Doc 36 - Pg 187). Aside from that issue, Doherty perceived no issues with either Rendon's recent or remote memory. (Doc 36 - Pg 187). In the end, Doherty recommended that Rendon not testify because Rendon could not provide an innocent explanation for the incriminating proof against him. As Doherty made unequivocally clear at the evidentiary hearing, however, his recommendation that Rendon not testify had nothing to do with any concerns over Rendon's competence. (Doc 36 - Pgs 189-90, 194, 214).

> The reason [Rendon] couldn't testify was entirely different from that. It was that he could not explain what he had done, explain what he had said and explain where he had been and what he had in his garage in any way that was consistent with innocence. That was his problem.

(Doc 36 - Pg 194).

Once at trial, Doherty found Rendon to be coherent and more than able to assist in his own defense. (Doc 36 - Pgs 195-96). There was never a question in Doherty's experienced judgment that Rendon continued to have a rational as well as factual understanding of the proceedings against him, and a sufficient, present ability to consult with Doherty with a reasonable degree of rational understanding. (Doc 36 - Pgs 195-96). Based on Doherty's observations, Rendon was "functioning mentally every step of the way. He's testing this information every step of the way. He's telling me questions to ask or offering me pointers on questions to ask every step of the way." (Doc 36 - Pg 255). As evidence of the latter point, Doherty provided the following example at the evidentiary hearing:

When we were in trial, Mr. Rendon was trying to explain to me and was explaining to me that the testimony that we just heard that somebody had gotten a truck and a trailer and backed it into – on a lot that abutted one of his rental properties and then off-loaded drugs into the rental property from this vacant lot.

He explained to me that would be very difficult, if not impossible to do, because the lot was so long and narrow and – the one that backed up to his rental apartment, it was so long and narrow that it would be, he said, impossible to get a trailer to go straight back to his rental unit . . . [H]e went so far as to draw me a little map to show me on 54th Avenue how you got to get into this vacant lot to off-load this – these drugs. And I still have it.

\* \* \*

But to me it tells me, A, I know what the witness is saying. B, I know what property he's talking about that I own. C, I know the adjacent property. I know the problems with the adjacent property and the approximate dimensions of that property enough to discuss it intelligently with my lawyer, which he did.

(Doc 36 - Pgs 178-79). In short, Doherty had absolutely no difficulties communicating with Rendon and, in fact, found him to be "one of the most functional people you'll ever meet." (Doc 36 - Pg 255).

Doherty's experience with Rendon's wife, Carol Rendon, during the time period Doherty represented Rendon, revealed that she had a vested interest in Rendon's case beyond simply her love for her husband. (Doc 36 - Pgs 197-98). While the Rendons had worked hard to amass their rental properties, it was clear to Doherty that Rendon had involved every one of these properties in his drug scheme and, thus, had subjected them all to forfeiture. (Doc 36 - Pg 196). Doherty raised this possibility with the Rendons from the outset and "sometimes . . . got the impression that Mrs. Rendon wanted to preserve those properties at all costs . . . " (Doc 36 - Pg 198).

It ultimately became evident to Doherty that "somebody [wa]s trying to sand bag" him by setting-up a false litigation strategy. (Doc 36 - Pg 243). This suspicion was

confirmed on the day of trial when Carol Rendon provided him with a short letter from Dr.

Sinclair, which stated the following:

> I'm seeing Mr. Miguel A. Rendon 8/02/1934 in my neurologic practice here in Bradenton. I am writing this letter at the request of he and his wife. He has a mild cognitive impairment which is a sign or form of early dementia.
>
> He would be expected to have some difficulty with memory or if under duress, such as testifying for Court, could have some trouble formulating thought. I have some suspicion that he also has depression, a likely reaction to his given circumstance, which can impair memory and attention.
>
> This should be taken under consideration *if he is to testify*. If you have any further questions, contact me.

(See Govt's Hrg. Exh. 2) (emphasis added). While noting the considerations that should

be taken into account should Rendon testify, **at no point in his letter did Dr. Sinclair**

**indicate that Rendon was not competent to stand trial**.

Nonetheless, in abundance of caution, Doherty promptly brought Dr. Sinclair's letter

to the Court's attention the morning of trial, along with Dr. Sinclair's earlier medical report

detailing his examination of Rendon in **April 2007.** Doherty explained his reasons for taking

this precautionary measure at the evidentiary hearing:

> . . . I wanted to do that [i.e. to bring the note to the Court's attention] in abundance of caution because . . . this [note] is a loaded gun . . .
>
> It[ was] obvious[] to me that somebody's going to be saying something at a later date, and it's obvious to me that somebody is trying to set-up a record to say something at a later date.
>
> I want[ed] to make it clear if I can make it clear on the record that this gentleman, Mr. Rendon, is competent to stand trial on May 12, 2008, the day he's going to trial. And that I believe it. I've believed it from the beginning and I believe it now.

(Doc 36 - Pgs 213-14; 240-43).

After Dr. Sinclair's letter was read into the record, Rendon took the stand outside the

presence of the jury and testified that, although a wealthy man of retirement age, he continued ably to manage a half dozen or more rental properties that were collectively worth a million dollars, if not more. (Doc cr-109 - Pgs 7, 9). Rendon also admitted that his real estate business required him to take care of these properties, to collect rents on them, and to maintain records and ledgers as a mechanism for keeping track of his rental income. (Doc cr-109 - Pgs 8-10). To the extent Rendon had any real, as opposed to feigned, lapses of memory during this colloquy, Doherty made clear to the Court that, in the roughly 18 months he had represented him, he had "never had any impression that this gentleman had a mental or memory problem." (Doc cr-109 - Pg 19).

In a subsequent exchange with the Court, Doherty emphasized again that he had no reservations about Rendon's competency and only raised the matter of Dr. Sinclair's letter to insure that he preserved the record for appeal.

**Government**: [The defendant's] obviously – and I want to make this clear – fully competent at this point to assist in his own defense with respect to the government's case.

**Court**: (to Doherty) You are not making any suggestion otherwise?

**Doherty**: *No, I'm certainly not.*

**Court**: *As an officer of the Court.*

**Doherty**: *I really am bringing this up in an abundance of caution in three years' time, four years' time, I don't want somebody to say that you had this letter and you didn't mention it.*

**Court**: You did the right thing, Patrick, absolutely.

(Doc cr-109 - Pg 21) (emphasis added).

Doherty reiterated this point at the evidentiary hearing.

Q.    You made a representation as an officer of the Court at the time this issue came up in front of Her Honor that there was no

issue with respect to the defendant's competency?

A.   *There was no issue.*

Q.   No good faith basis even to raise it at all?

A.   *No. . . .*

(Doc 36 - Pg 214) (emphasis added); see also (Doc 36 - Pg 216) ("there's just no question that this guy [i.e. Rendon] was satisfactory to me in terms of his mental function . . . Was he perfect? No, he wasn't perfect. But he was certainly satisfactory *and he was certainly competent.*") (emphasis added); (Doc 36 - Pg 244) ("My client's competence was *never* in question to me.") (emphasis added).

On May 12, 2008, Rendon's case proceeded to trial. (Doc cr-100). At that trial, which lasted 7 days, the government called 6 cooperating defendants who testified regarding Rendon's pervasive and long-standing involvement in the conspiracy, including his renting of properties to co-conspirators for their use in the drug trade, often in exchange for drug proceeds; Rendon's active involvement in the off-loading of drug shipments; and his conducting of drug deals himself. (See PSR at ¶¶ 11-19, 21); (Docs cr-101, 102, 104, 112).

In Rendon's case-in-chief, Doherty called several witnesses – including Carol Rendon and a former Palmetto Police Department Chief – to refute the government's proof. Of significance to the instant section 2255 motion, at no point during her testimony did Carol Rendon indicate that her husband was not competent to stand trial.

At the conclusion of the case, the jury found Rendon guilty as charged. (Doc cr-118). In advance of sentencing, Rendon was interviewed by the Probation Office and flatly "denie[d] any history of mental or emotional problems or history of treatment for such problems," and noted only that he was "depressed because of being tried and convicted

of the instant offense." (PSR at ¶ 50).

On September 19, 2008, the Court sentenced Rendon to a term of imprisonment of 235 months. (Docs cr-144, 150).

Rendon directly appealed his final judgment to the Eleventh Circuit, arguing that the Court had abused its discretion in admitting certain evidence at trial. Rendon's appellate counsel, however, did not raise any issue with respect to Rendon's competency to stand trial. On September 28, 2009, the Eleventh Circuit affirmed Rendon's conviction in an unpublished, per curiam opinion. See *United States v. Rendon*, 359 Fed. App'x 80 (11th Cir. 2009); (Doc cr-187).

Doherty was adamant during cross examination that Rendon was competent to stand trial because he met the standard: Rendon understood the nature and consequences of the proceedings against him and he was able to assist properly in his defense. (See Doc 36 - Pgs 217-269 [transcript of cross examination] attached to this Order as Exhibit 4.)

## DISCUSSION

Under the two (2) prong analysis announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a section 2255 movant asserting ineffective assistance of counsel claims must show (1) that his attorney's performance fell below an objective standard of reasonable professional assistance, and (2) that he was prejudiced by that deficient performance. *Id.* at 687. A petitioner's failure to prove both of these prongs is fatal to any request for collateral relief. *Id.* at 697. For an attorney's performance to be deemed constitutionally deficient, a section 2255 movant bears the "heavy" burden of showing that his counsel's conduct fell outside the wide range of professionally competent assistance under the particular facts of his case. *Id.* at 690; *Chandler v. United States*, 218 F.3d 1305,

1313-14 (11th Cir. 2000) (en banc). In other words, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler,* 218 F.3d at 1315. The issue in this regard "is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Id. at 1313 (quoting *Burger v. Kemp,* 483 U.S. 776 (1987)).

In undertaking this analysis, courts "must avoid second-guessing counsel's performance," must avoid "using 'the distorting effects of hindsight,' and must evaluate the reasonableness of counsel's performance 'from counsel's perspective at the time.'" *Id.* at 1314, 1316 (quoting *Strickland*, 466 U.S. at 689). Furthermore, "[c]ourts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (quoting *Strickland*, 466 U.S. at 689-90).

With respect to the second prong of the *Strickland* analysis, a section 2255 movant must demonstrate that there is a reasonable probability that, but for his attorney's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Rendon has failed to satisfy his heavy burden. It is well settled that a defendant is deemed to be incompetent to stand trial only if he "lacks 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'has a rational as well as factual understanding of the proceedings against him.'" *United States v. Mateo*, 413 Fed. Appx. 197, 203 (2011)(quoting *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996)); see also *Sanchez v. U.S*., 2009 WL 812064, at *3 (M.D. Fla. Mar. 25, 2009)

(Kovachevich, J.).

In this case, even Dr. Rothschild concedes that Rendon "likely had a rational as well as factual understanding of the proceedings against him." Dr. Rothschild's conclusion is abundantly supported by all of the evidence before the Court, including Doherty's testimony to the same effect, as well as the Court's own observations of Rendon's behavior during the course of his criminal case. Rendon cannot now credibly claim that, in light of all of this information, no competent counsel would have concluded – as Doherty did and as Dr. Rothschild now does – that Rendon did not have a rational as well as factual understanding of the proceedings against him.

The only issue posed by Rendon's motion, therefore, is whether Doherty was constitutionally ineffective in concluding that Rendon also had the sufficient, present ability to consult with him with a reasonable degree of rational understanding. As with first prong, Rendon must demonstrate in this regard that "no competent counsel" would have arrived at the same determination that Doherty did based on Doherty's perspective at the time. *Chandler, supra.* In doing so, Rendon must overcome the "strong presumption" that Doherty's performance was reasonable and that he "made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* This Rendon has not done.

Doherty is one of the most experienced and distinguished members of the criminal defense bar, and both his credibility before the Court as well as his reputation as one of the best defense attorneys in the area is beyond challenge. His position that Rendon was fully competent to stand trial has been both unequivocal and unwavering. Dating back to the commencement of the trial in May 2008, Doherty made clear as an officer of the Court that he had no reservations whatsoever regarding Rendon's competency.

Doherty reiterated that position during the course of his testimony at the evidentiary hearing and explained in abundant detail the reasons for his assessment that Rendon was competent. Despite watching Rendon "like a hawk" for a year and a half, Doherty saw nothing in his many meetings and conversations with Rendon that would have led him to remotely suspect Rendon was incompetent.

Doherty's experienced assessment that Rendon was "clearly" and "completely competent" – born as it was of his many years as a defense lawyer as well as his many months representing Rendon – is entitled to tremendous weight here. As the Eleventh Circuit recently pointed out in *Mateo, supra*, "'[b]ecause legal competency is primarily a function of [a] defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect.'" *United States v. Mateo*, 413 Fed. Appx. 197, 203 (2011)(quoting *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996)).

Rendon's efforts to attack Doherty's experienced judgment through Dr. Rothschild fail, as the Court rejects Dr. Rothschild's testimony as unpersuasive. Dr. Rothschild's testimony is the type of "second guessing" which both the Supreme Court and the Eleventh Circuit have explicitly admonished the courts to avoid. Reduced to its essence, Dr. Rothschild's retrospective assessment of Rendon's competency – which he conceded is inherently problematic – is built upon unchallenged hearsay statements made mainly by two witnesses, Carol and Mike Rendon , both of whom have a clear bias and both of whom, rather conspicuously, were never called by Rendon to testify at the evidentiary hearing. Had they been, they would have been impeached, in the case of Carol Rendon, by her own trial testimony, and, in the case of both her and Mike Rendon, by the other evidence

presented at trial which contradicted the assertions they made to Dr. Rothschild. Even Dr. Sinclair – who found Rendon's mental status to be normal in his only report documenting a full examination of Rendon – was not called by Rendon to provide his thoughts on the matter of Rendon's mental status prior to trial.

Finally, Rendon has not shown, as he must, that he was prejudiced by Doherty's handling of the competency issue. Dr. Sinclair's cursory letter presented to Doherty on the morning of trial pertains only to Rendon's ability to testify at trial, yet it was decided for independent reasons by both Rendon and Doherty that Rendon would not testify in his own defense.

Rendon claims that, based on the record and the testimony presented at the evidentiary hearing, defense counsel rendered ineffective assistance of counsel by failing to properly challenge Rendon's competency to stand trial. Rendon properly contends that a defendant is mentally incompetent to stand trial when he is "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (quotation omitted).

Rendon relies on Dr. Rothschild's testimony to meet the *Strickland* prejudice standard.  Dr. Rothschild opined that there is "a substantial doubt that [Rendon] was not competent" at the time of trial (i.e., there is a probability sufficient to undermine confidence in the conclusion that Rendon was competent at the time of trial). (Doc 36 - Pg 62). Rendon contends that because the Government has not presented any medical/expert testimony to refute Dr. Rothschild's opinion, Dr. Rothschild's opinion stands. The Court rejects this

argument because the most appropriate person to determine whether Rendon met the two prong test of whether Rendon was competent at the time of trial (i.e. the Defendant lacks sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him) was Doherty, who did testify at the evidentiary hearing.

The Court finds Doherty's testimony at the evidentiary hearing credible and finds that, based on the testimony at the hearing and on the entire record in the criminal and civil case, Rendon had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and had a rational as well as factual understanding of the proceedings against him.

Likewise, the Court rejects Rendon's contention that no reasonable attorney, – upon being presented with Dr. Sinclair's letter on the eve of trial – would fail to request a competency evaluation. It is true that 18 U.S.C. § 4241(a) provides, in pertinent part, that "[a]t any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant . . . the defendant . . . may file a motion for a hearing to determine the mental competency of the defendant," which the court shall grant "if there is *reasonable cause* to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent." Doherty had no reasonable cause to believe that Rendon was incompetent.

Rendon also claims that Doherty should have filed a motion for a competency hearing based on the colloquy conducted before the trial began, following Doherty's calling Dr. Sinclair's letter to the attention the Court. This claim has no merit. Doherty spent a great deal of time with Rendon prior to trial and was convinced, as an officer of the court,

that Rendon was competent. Doherty recognized the possibility of being "sandbagged," by this letter. The brief colloquy, conducted as a result of the letter requested by Carol Rendon did not demonstrate that Rendon was incompetent.

In short, Rendon has failed to show – as he must – that Doherty's handling of the alleged incompetency issue fell below an objective standard of reasonable professional assistance, and that he was prejudiced by that allegedly deficient performance. Rendon has not shown that Doherty was ineffective for failing to move for an competency hearing for Rendon prior to trial.

## APPELLATE COUNSEL NOT INEFFECTIVE

The governing standard for ineffective assistance of appellate counsel is the same as set forth in *Strickland, supra*: counsel rendered deficient performance, and the deficient performance prejudiced the petitioner. Appellate counsel does not perform deficiently for failing to raise every non-frivolous ground for appeal. *Smith v. Robbins*, 528 U.S. 259, 288, (2000). Indeed, "the practice of 'winnowing out' weaker arguments on appeal, so to focus on those grounds that are more likely to prevail, is the 'hallmark of effective appellate advocacy.' " *Hargrove v. Solomon*, 227 Fed. Appx. 806, 808 (11th Cir. 2007) (citing *Smith v. Murray*, 477 U.S. 537, 536 (1986)). Furthermore, for the petitioner to be prejudiced, he must show a reasonable probability that the outcome of the appeal would have been different, not the outcome of the trial on remand. Clark v. Crosby, 335 F.3d 1303, 1312 n. 9 (11th Cir. 2003).

Because Doherty was not ineffective for failing to move for a competency hearing for Rendon prior to trial, appellate counsel was not effective for failing to raise this issue on direct appeal.

Accordingly, the Court orders:

1. The Court adopts and incorporates herein Document Nineteen (Doc 19) which denies grounds two, three, four, five, and six of Rendon's 28 U.S.C. § 2255 motion to vacate, set aside, or correct an illegal sentence.

2. That Rendon's 28 U.S.C. § 2255 motion to vacate, set aside, or correct an illegal sentence (Doc 1; Doc cr 200) is denied.

3. That the government's oral motion for miscellaneous relief, specifically that Rendon has not met his burden (Doc 31) is granted.

The Clerk is directed to enter judgment against Rendon and to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Defendant is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that the issues presented were adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Defendant has not made the requisite showing in these circumstances.

Finally, because Defendant is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on November 22, 2011.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record
Patrick Doherty, Esq.